1  David J. Gottesman (Trial Counsel) (Illinois Bar No. 6182719)
   (gottesmand@sec.gov)
2  Frederick L. Block
   Antonia Chion
3  Robert A. Cohen
   Melissa R. Hodgman
4  David S. Mendel

**E-filing**

5  Attorneys for Plaintiff
   SECURITIES AND EXCHANGE COMMISSION
6  100 F Street, N.E.
   Washington, DC 20549-4030
7  Telephone: (202) 551-4470 (Gottesman)
   Facsimile: (202) 772-9245 (Gottesman)

8

9                    UNITED STATES DISTRICT COURT

10                 NORTHERN DISTRICT OF CALIFORNIA

11                     SAN FRANCISCO DIVISION

12

13  SECURITIES AND EXCHANGE COMMISSION,     Case No.   0136

14              Plaintiff,

15       vs.

16  CHARLES SCHWAB INVESTMENT                COMPLAINT

    MANAGEMENT, INC.; CHARLES SCHWAB &
17
    CO., INC.; and SCHWAB INVESTMENTS,
18
                Defendants.
19

20

21       Plaintiff Securities and Exchange Commission (the "Commission") alleges:

22                   **SUMMARY OF THE ACTION**

23       1.    These proceedings arise out of the offer, sale, and management of the Schwab

24  YieldPlus Fund (the "Fund" or "YieldPlus Fund"), a fixed-income mutual fund managed by

COMPLAINT                              -1-

1   Charles Schwab Investment Management, Inc.; marketed and distributed by Charles Schwab

2   & Co., Inc.; and which suffered a significant decline during the credit crisis of 2007-2008.

3       2.     Between 2005 and mid-2008, Charles Schwab Investment Management, Inc.

4   ("CSIM"), Charles Schwab & Co., Inc. ("CS&Co."), and Schwab Investments: (1) offered

5   and sold the Fund as a cash alternative without adequately disclosing the differences between

6   the Fund and the cash investments with which it was compared, which misled investors; (2)

7   deviated from the Fund's concentration policy when it invested more than 25% of Fund assets

8   in non-agency mortgage-backed securities without obtaining a shareholder vote as required by

9   statute; (3) made inaccurate statements concerning the Fund while its NAV declined; and (4)

10   failed to establish and implement internal controls reasonably designed to prevent the misuse

11   of material, nonpublic information.

12                           **JURISDICTION AND VENUE**

13       3.     This Court has jurisdiction over this action under Sections 20(d) and 22(a) of

14   the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77t(d) and 77v(a)]; Sections 21(d)

15   and 27 of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d) and

16   78aa]; Sections 42(e) and 44 of the Investment Company Act of 1940 ("Investment Company

17   Act") [15 U.S.C. §§ 80a-41(e) and 80a-43]; and Sections 209(e) and 214 of the Investment

18   Advisers Act of 1940 ("Advisers Act") [15 U.S.C. §§ 80b-9(e) and 80b-14]. Defendants have

19   made use, directly or indirectly, of the means or instrumentalities of interstate commerce, of

20   the mails, or of the facilities of a national securities exchange, in connection with the

21   transactions, acts, practices and courses of business alleged in this Complaint.

22       4.     Venue is appropriate in this Court under Section 22(a) of the Securities Act [15

23   U.S.C. § 77v(a)]; Section 27 of the Exchange Act [15 U.S.C. § 78aa], Section 44 of the

24   Investment Company Act [15 U.S.C. § 80a-43]; and Section 214 of the Advisers Act of [15

1 | U.S.C. § 80b-14], because certain of the acts or transactions constituting the violations alleged
2 | herein occurred in this judicial district.

3 | **INTRADISTRICT ASSIGNMENT**

4 | 5. Assignment to the San Francisco Division is appropriate pursuant to Civil
5 | Local Rule 3-2(d) because a substantial part of the events that give rise to the Commission's
6 | claims occurred in San Francisco and a related class action was litigated in the San Francisco
7 | Division.

8 | **DEFENDANTS**

9 | 6. **Charles Schwab Investment Management, Inc. ("CSIM")** is a San
10 | Francisco-based, wholly-owned subsidiary of Charles Schwab Corporation. CSIM was
11 | incorporated in Delaware in October 1989 and has been a registered investment adviser since
12 | January 25, 1990. CSIM manages the assets of registered and unregistered investment
13 | companies, including the Fund and other Schwab-branded mutual funds.

14 | 7. **Charles Schwab & Co., Inc. ("CS&Co.")** serves as the distributor and
15 | transfer agent for the Fund. CS&Co. is a registered broker-dealer, transfer agent, and
16 | investment adviser. Various CS&Co. employees, including the product development and
17 | management group responsible for marketing the YieldPlus Fund and other Schwab funds,
18 | provided services to CSIM and the Fund. CS&Co. is a wholly-owned subsidiary of Schwab
19 | Holdings, Inc., which in turn is a wholly-owned subsidiary of the Charles Schwab
20 | Corporation. CS&Co. was incorporated in California in 1971.

21 | 8. **Schwab Investments** is a no-load, open-end management investment company
22 | organized as a Massachusetts business trust and is organized as a series investment company
23 | registered under the Investment Company Act as of October 26, 1990. The YieldPlus Fund
24 | and the Schwab Total Bond Market Fund are series issued by Schwab Investments.

COMPLAINT -3-

1

## **FACTUAL ALLEGATIONS**

2

**A.    Background**

3          9.      The YieldPlus Fund, formed in 1999, is an ultra-short bond fund that, until

4    mid-2008, primarily invested in mortgage-backed securities ("MBS"), asset-backed securities,

5    and corporate bonds. Ultra-short bond funds are fixed-income funds with durations usually

6    less than one year. Unlike maturity, duration is not a measurement of time; instead, duration

7    is a ratio that reflects a fund's sensitivity to interest rate changes. Ultra-short bond funds

8    generally maintain short durations by investing in fixed income securities with short-term

9    maturities and by using interest rate hedging strategies. YieldPlus owned many long-maturity

10   bonds, but the Fund used an interest rate hedging strategy to maintain a low duration and

11   preserve its classification as an ultra-short fund.

12         10.     As recited in its prospectus, the Fund's investment objective is to seek "high

13   current income with minimal changes in share price." The YieldPlus Fund's assets grew

14   significantly after its formation, becoming CSIM's largest variable net asset value ("NAV")

15   fund in 2006. The NAV of a fund is a daily calculation of the fund's assets per share, minus

16   its liabilities. To calculate a fund's NAV per share, a fund takes the total current market or

17   fair value of its holdings, subtracts liabilities, and divides by the number of shares

18   outstanding. Variable NAV funds are distinguished from money market funds, which have an

19   NAV per share of a $1.00 that normally does not fluctuate.

20         11.     At its peak in 2007, the YieldPlus Fund had $13.5 billion in assets and over

21   200,000 accounts, making it the largest ultra-short bond fund in the category. For several

22   years, the Fund was one of the best performing funds in the ultra-short category, first earning

23   a 5-star Morningstar rating in late 2004 for its 3-year performance.

24

1    12.    The Fund suffered a significant decline during the credit crisis of 2007-2008

2    that led to declines in some bond valuations.  During an eight-month period, the Fund's NAV

3    dropped 28% and its assets under management fell from $13.5 billion to $1.8 billion due to

4    redemptions and declining asset values.

5    **B.    Offer and Sale of the YieldPlus Fund**

6    13.    From at least 2006 to 2008, CSIM and CS&Co. described the Fund as a cash

7    "alternative" that generated a higher yield with slightly higher risk than a money market fund.

8    Some communications emphasized that the Fund's NAV "may fluctuate minimally."  Others

9    stated that the NAV "would fluctuate" but noted that it had fluctuated by only pennies in

10   recent years.  The Fund had experienced some volatility from its inception in 1999 through

11   2002, and then fluctuated by pennies during the next several years.  Nevertheless, the

12   statements were misleading because the YieldPlus Fund was not slightly riskier than money

13   market funds, CDs and other cash alternatives to which it was compared.  Investments in the

14   Fund are not insured, as are CDs, and the maturity and credit quality of the Fund's securities

15   were significantly different than those of a money market fund.  Although the Fund's

16   prospectus informed investors that the Fund was not a money market fund and better

17   explained the differences among these investments, the disclosure was insufficient to remedy

18   the misleading statements and omissions in the offer and sale of the Fund.

19   14.    In 2004, the NASD raised concerns with CS&Co. about advertisements that

20   compared the YieldPlus Fund to money market funds without adequate disclosure of the

21   differences between the products.  In response to the NASD's concerns, CS&Co. added the

22   word "slightly" to the advertisements, stating that the Fund was "designed to provide a higher

23   yield with slightly higher risks than a money market fund but with less risk than a long-term

24   bond fund."  CS&Co. also added, in some advertisements, a statement that the Fund's

COMPLAINT                                   -5-

1  "investment value will fluctuate and shares, when redeemed, may be worth more or less than

2  original cost." In its advertisements and other communications, however, it continued to

3  describe the Fund as a cash alternative and did not highlight the differences between the Fund

4  and a money market fund.

5          15.     In 2006, a Commission examination included a finding that YieldPlus Fund

6  sales materials did not include balanced disclosure and could mislead investors because they

7  compared the Fund to money market funds without describing the differences between these

8  two investments. Commission staff communicated the finding to Schwab Investments,

9  CSIM, and CS&Co. In response, CSIM and CS&Co. added additional disclosure in the

10  Fund's prospectus about the differences between the YieldPlus Fund and money market funds

11  but did not include the additional disclosure in its advertisements and other sales

12  communications until after the Fund's NAV began to decline in 2007.

13          16.     In 2006, a group of high-level executives for Charles Schwab Corporation and

14  its related entities, referred to as the "Cash Council," held a series of meetings about the many

15  cash alternative products across their operating businesses. Products addressed in the

16  meetings included accounts at Schwab Bank, sweep money market funds, purchased money

17  market funds, and CDs. The Council asked one of its members, and his product placement

18  group at CS&Co., to recommend an "attractive yield product" to be marketed with cash

19  products. They identified the YieldPlus Fund. Following that recommendation, the Council

20  sought to "[m]ake it easier to see information about Yield Plus [sic] on the web, including

21  links to it from pages where we talk about cash and information about it that includes

22  consistently up to date SEC Yield info," and to highlight the Fund's recent limited NAV

23  fluctuation. As a result, various links and content were added to Schwab's website, which

24

COMPLAINT                                    -6-

1   typically characterized the Fund as a long-term cash alternative even though it had previously

2   been marketed with short-term and long-term bond funds.

3       17.     Some CS&Co. registered representatives also described the YieldPlus Fund as

4   a cash alternative with minimal price fluctuation when discussing the Fund with investors.

5   Periodically, representatives called customers with fixed-income investments coming due,

6   such as maturing CDs, and highlighted the YieldPlus Fund as an option for investing the

7   proceeds. They emphasized what they described as the Fund's historically narrow NAV

8   fluctuation, and minimized its potential for volatility.

9       18.     As a result of the above, Respondents failed to adequately inform investors

10  about (1) the risks associated with investing in the YieldPlus Fund and (2) the differences

11  between the Fund and other investments.

12      **C.      Understating the Fund's Weighted Average Maturity**

13      19.     A fund's weighted average maturity ("WAM") is a measurement of the

14  average length of time until the underlying bonds in a portfolio mature. WAM can be used by

15  investors to evaluate the riskiness of a product; among similar funds, those with a longer

16  WAM generally involve more risk. A fund's duration is different than WAM; duration is a

17  mathematical measure of a fund's sensitivity to interest rate risk, but is not a measurement of

18  time. For the relevant period, the YieldPlus Fund's duration was a lower number than its

19  WAM.

20      20.     Between February 2006 and September 2007, in some communications with

21  investors, Schwab substituted the Fund's duration for its WAM, in some instances without

22  noting the change. The resulting understatement appeared in sales and marketing materials

23

24

COMPLAINT                                    -7-

1    and one Commission filing, a Form N-CSR Annual Report dated August 31, 2007.[1] In other

2    communications provided to investors during the same period, Respondents reported the

3    Fund's correct WAM. These included various semi-annual and annual reports, which were

4    filed with the Commission and sent to shareholders, and quarterly fact sheets that were posted

5    on Schwab's public website.

6        21.    In early 2006, the YieldPlus Fund's WAM increased significantly to over one

7    to two years in length because of a change in the calculation method used by CSIM's new

8    fund accountant. Investors noticed the change. CSIM and CS&Co. then listed the Fund's

9    duration in place of its WAM in the sales materials, including tables that listed statistics for all

10   Schwab's funds and, internal daily reports. Schwab did not replace WAM with duration for

11   any other fund.

12       22.    In some communications, CS&Co. and CSIM noted the replacement with a

13   footnote indicating that duration, not WAM, was listed. However, in tables on the

14   Schwab.com website, one Commission filing, and two issues of *On Investing* magazine,

15   CS&Co. and CSIM did not include the footnote. As a result, for eighteen months, the website

16   indicated that the average maturity of the Fund's bonds was six months when the Fund's

17   WAM actually ranged from at least 1.3 to 2.2 years.

18       23.    In addition, the duration number that Respondents listed was not accurate.

19   Although the Fund's duration fluctuated from 0.4 to 0.6, CS&Co. and CSIM hard-coded the

20   number "0.5" into some tables and documents instead of updating the information on a daily

21   basis. This inaccurately suggested that the Fund's duration (or WAM, when the footnote was

22   omitted) was constant rather than variable.

23

24   [1] Respondents voluntarily advised the Commission's staff of this issue during the course of the investigation.

COMPLAINT                                    -8-

1    **D.    Deviations From the Bond Funds' Concentration Policy**

2        24.    Section 8 of the Investment Company Act requires that funds' registration

3    statements contain a recital of certain investment policies, including a policy regarding

4    concentration of investments in particular industries.  Under Section 13(a)(3) of the

5    Investment Company Act, once a fund recites a concentration policy, it must obtain

6    shareholder approval to "deviate from its policy in respect of concentration of investments in

7    any particular industry or group of industries as recited in its registration statement . . .."

8        25.    To comply with Section 8 of the Investment Company Act, Schwab

9    Investments recited a single concentration policy for the taxable bond funds, including the

10   YieldPlus Fund and the Total Bond Fund.  The funds stated in their registration statement that

11   they would not concentrate in any industry.  They defined concentration as investing more

12   than 25% of their assets in an industry.  Before August 2006, the concentration policy

13   specifically stated: "Based on characteristics of mortgage-backed securities, each fund has

14   identified mortgage-backed securities issued by private lenders and not guaranteed by the

15   U.S. government agencies or instrumentalities as a separate industry for purposes of a fund's

16   concentration policy."  Because they identified non-agency MBS as an industry, the YieldPlus

17   Fund and the Total Bond Fund could not invest more than 25% of their assets in non-agency

18   MBS without obtaining shareholder approval under Section 13(a).

19       26.    By early 2006, under CSIM's direction, the YieldPlus Fund deviated from the

20   concentration policy by investing more than 25% of Fund assets in non-agency MBS.  Before

21   September 2006, Respondents inconsistently classified several securities in filings with the

22   Commission.  If those securities had been consistently treated as MBS, Fund filings would

23   have reflected the deviation from its concentration policy by approximately 2-3% of the

24   Fund's assets.  In addition, the Fund also exceeded the concentration limit because it excluded

COMPLAINT                                    -9-

1 | certain categories of non-agency MBS, such as commercial MBS, when it calculated its

2 | investment in non-agency MBS.

3 | 27. In mid-2006, the Fund increased investments in non-agency MBS because of,

4 | among other things, the Fund's portfolio managers' concerns about increasing corporate buy-

5 | out activity and the credit risks associated with corporate bonds. In August 2006, CSIM

6 | requested that the Schwab Investments' board of trustees change the concentration policy to

7 | reclassify non-agency MBS such that it would not be an industry to allow more than 25% of

8 | Fund assets to be invested in non-agency MBS. Without the shareholder approval required by

9 | statute, the board of trustees voted on August 29, 2006, to approve the change. The YieldPlus

10 | Fund's investment in non-agency MBS increased after the purported change to 50% of assets

11 | in the Fund's portfolio, with nearly all of the MBS being rated AAA. By at least October

12 | 2006, the Total Bond Fund also invested more than 25% of its assets in non-agency MBS.

13 | 28. Schwab Investments did not follow the required procedure for disclosing the

14 | purported change to its registration statement. On September 1, 2006, it filed a Form 497

15 | amending the taxable bond funds' prospectus, but not its registration statement as required by

16 | the Investment Company Act. In November 2006, Schwab Investments filed an amendment

17 | to its registration statement that reflected the purported change to the concentration policy.

18 | Amendments involving material changes, such as a change to a fund's concentration policy,

19 | must be filed on Form 485A, which typically are reviewed by Commission staff and become

20 | effective after 60 days. Schwab Investments, however, filed the amendment on Form 485B,

21 | with certifications that the filing did not contain any material changes. Filings on Form 485B

22 | typically are effective immediately and not reviewed by Commission staff. Schwab

23 | Investments should have filed on Form 485A.

24 |

COMPLAINT                    -10-

1     **E.     Misrepresentations During the Fund's Decline**

2         29.     As the credit crisis unfolded and bond valuations declined in the summer of

3     2007, the Fund's NAV began to decline and many investors redeemed their holdings.  Unlike

4     money market funds, which can rely on maturing securities to generate cash, only $675

5     million, representing 6% of the Fund's over $11.2 million in assets, were scheduled to mature

6     within the next six months.  As a result, the Fund had to sell assets in a depressed market to

7     raise cash to meet redemptions.

8         30.     As the NAV declined, CSIM and CS&Co. held a series of conference calls and

9     issued written materials to investors, independent investment advisers, and CS&Co. registered

10    representatives.  CS&Co. representatives also spoke with many individual customers.  In

11    these communications, CSIM and CS&Co. expressed confidence in the Fund; urged investors

12    to have a patient, long-term perspective; and emphasized that most of the Fund's NAV

13    decline represented unrealized, rather than realized, losses.

14        31.     During the decline, CSIM and CS&Co. made a number of material

15    misstatements and omissions concerning the Fund.  For example, during two prescheduled

16    conference calls in August 2007, the Fund's then-lead portfolio manager ("Lead Portfolio

17    Manager"), who also was CSIM's Chief Investment Officer for Fixed Income, understated the

18    Fund's redemptions at the time.  During the first two weeks of August, investors redeemed

19    almost $1.2 billion from the Fund, or approximately 10% of Fund assets.  During this same

20    two-week period, the YieldPlus Fund sold over $2.1 billion in portfolio securities—16% of

21    assets—to raise cash to meet redemptions.  The Lead Portfolio Manager monitored

22    redemption levels throughout each day and reviewed a detailed summary each evening.

23    During this time period, on August 8, 2007, another Fund portfolio manager sent an email to

24    the Lead Portfolio Manager, the President of CSIM, and others saying "we need flows to

COMPLAINT                                           -11-

1   stabiliz[e]." On August 11, 2007, the Lead Portfolio Manager sent an email to the President

2   of CSIM saying "[i]f the Advisor community starts to bail out, who [sic] has been stable to

3   this point, we will be in trouble." On Sunday, August 12, 2007, the Lead Portfolio Manager

4   sent an email regarding his deletion of information about the Fund's holdings and assets under

5   management information from a Q&A for the Schwab website. In the email, he said, "I don't

6   want anyone to sense that we are having outflows."

7       32.    On August 14, 2007, the Lead Portfolio Manager held a conference call with

8   registered investment advisers to discuss the Fund. During the question and answer portion of

9   the call, an adviser asked him, "how expensive have your redemptions been since the

10  decline?" During his response, the Lead Portfolio Manager said that some advisers had

11  purchased more shares, and "we've got very, very, very slight negative flows over the course

12  of the last week or two." Two days later, on August 16, 2007, the Lead Portfolio Manager

13  held a conference call with CS&Co. registered representatives. In that call, a representative

14  asked "what are the net outflows of the Schwab Yield Plus [sic] fund to date?" During his

15  answer, the Lead Portfolio Manager said, "[i]t's not that much. . . . So outflows have been

16  minimal." These statements were false and misleading. The Fund's outflows, which already

17  had required over $2 billion in asset sales to that point, were not "very, very, very slight" or

18  "minimal." After the conference calls, some CS&Co. representatives communicated the Lead

19  Portfolio Manager's comments to Fund investors.

20      33.    Another example involves a November 2007 internal memorandum that

21  circulated a set of talking points. CSIM and CS&Co. prepared and circulated the talking

22  points to assist CS&Co. representatives in responding to questions about the Fund. Both the

23  President of CSIM and the Lead Portfolio Manager reviewed, and the President approved, the

24  talking points document, which repeated the positive theme, stating, among other things, that

COMPLAINT                                    -12-

1   "[t]he portfolio management team has confidence in the Fund's strategy" and that "[d]espite

2   the recent spike in bond market volatility, history suggests this is a temporary condition." The

3   talking points document was inconsistent with contemporaneous internal emails discussing

4   the Fund that were sent by the portfolio manager responsible for providing daily updates to

5   management. In one email, a YieldPlus Fund portfolio manager reported to the Lead

6   Portfolio Manager, the President of CSIM, and other senior executives that raising cash "was

7   like pulling teeth" and that "[l]iquidity is AWFUL....period." In a second email, the same

8   portfolio manager reported to the Lead Portfolio Manager that "it[']s not better today and

9   likely won't be for some time." In a third email, he reported to the executives that "we are

10  hostage to the market at this point and can't improve the NAV." In light of the Fund's

11  holdings, and the market conditions at the time, CSIM and CS&Co.'s statements were

12  incomplete and misleading.

13          34.     CSIM and CS&Co. made other inaccurate statements and omissions. These

14  included statements that: (1) the Fund was selling securities to raise cash to capitalize on

15  purchasing opportunities in the current market environment and to meet redemptions, when

16  meeting redemptions was the motivation for the sales; and (2) the Fund had a short maturity

17  structure that had mitigated the price erosion experienced by some of the Fund's peers.

18          **F.      Redemptions by Schwab-Related Funds and Individuals**

19          35.     Although CS&Co. and CSIM's policies broadly prohibited trading on the basis

20  of material, nonpublic information, those entities did not have adequate policies and

21  procedures to prevent the misuse of material, nonpublic information about the Fund, taking

22  into consideration the nature of their businesses. For example, CSIM and CS&Co. did not

23  have policies in place to review redemptions of Fund shares by all Schwab-related personnel

24  and funds for compliance with the general policy. Moreover, although certain people (such as

COMPLAINT                                        -13-

1    the Fund's own portfolio managers) had to obtain pre-approval for personal trades of the

2    Fund's shares, individuals whose responsibilities provided them with material, nonpublic

3    information about the Fund had no pre-approval obligations. CSIM and CS&Co. also failed

4    to maintain appropriate information barriers concerning nonpublic and potentially material

5    Fund information. Finally, CSIM and CS&Co. had no specific policies and procedures

6    governing redemptions by portfolio managers who advised Schwab funds of funds. As a

7    result, several Schwab-related funds and individuals were free under CSIM and CS&Co.'s

8    policies and procedures to redeem their own investments in the Fund during the Fund's

9    decline.

10    36.      One instance involved Schwab Charitable, a 501(c)(3) public benefit

11    corporation that is not a subsidiary of Charles Schwab Corporation. On March 5, 2008,

12    Schwab Charitable's Investment Oversight Committee voted to recommend to its board that

13    the fund redeem its $91 million investment in the YieldPlus Fund due to the Fund's poor

14    performance. The recommendation was scheduled for discussion and vote by the Charitable

15    Fund's board on March 12, 2008, at its next scheduled meeting. On March 7, 2008, however,

16    the fund's Chief Operating Officer ("COO") unilaterally decided to redeem the fund's entire

17    investment before the board approved the decision. Prior to the redemption, the COO had

18    received an email from CSIM that contained a mix of public and nonpublic information

19    regarding the Fund and its recent decline. The email was forwarded to the COO by a CS&Co.

20    employee who had no business reason for receiving it but was a member of Charitable's

21    Investment Oversight Committee.

22    37.      A second instance involved redemptions in March 2008 by the Schwab Target

23    Date Funds, which are CSIM-managed, fund-of-fund mutual funds with primarily retail

24    investors. The Target Date Funds' senior portfolio manager served as CSIM's Chief

COMPLAINT                     -14-

1   Investment Officer for Equities ("CIO-Equities"). The CIO-Equities had access to two

2   potential sources of nonpublic information regarding the Fund when he accelerated the Target

3   Date Funds' redemptions of their YieldPlus investments. First, he participated in internal

4   meetings between CSIM's President and his direct reports. During these meetings, the Lead

5   Portfolio Manager and other executives discussed the YieldPlus Fund, including nonpublic

6   information about the Fund's redemption levels and plans to satisfy redemptions. Second, the

7   CIO-Equities was a member of Charitable's Investment Oversight Committee, and in that

8   capacity learned that Schwab Charitable intended to redeem its YieldPlus Fund investment.

9   The CIO-Equities informed the CSIM President of his intention to redeem and the CSIM

10   President approved the redemption.

11   **FIRST CLAIM FOR RELIEF**

12   (Against CSIM and CS&Co.)<br>Violations of Sections 17(a)(2) and (3) of the Securities Act [15 U.S.C. § 77q(a)(2) and (3)]

13

14      38.   The Commission realleges and incorporates by this reference Paragraphs 1

15   through 37 above.

16      39.   CSIM and CS&Co., directly or indirectly, in the offer or sale of securities, by

17   use of the means or instruments of transportation or communication in interstate commerce or

18   by use of the mails, obtained money or property by means of untrue statements of material

19   fact or by omitting to state a material fact necessary in order to make the statements made, in

20   light of the circumstances under which they were made, not misleading; and engaged in

21   transactions, practices, or courses of business which operated or would operate as a fraud or

22   deceit upon the purchasers.

23      40.   CSIM and CS&Co. willfully violated anti-fraud provisions of the Securities

24   Act, Sections 17(a)(2) and (3) [15 U.S.C. § 77q(a)(2) and (3)], when, as described above,

COMPLAINT           -15-

1    they: (1) made materially misleading statements and omissions about the Fund and its risk

2    before the Fund's NAV declined; (2) made materially misleading statements and omissions

3    during the Fund's NAV decline; and (3) materially understated the Fund's WAM from

4    February 2006 to September 2007 in certain communications.

5        41.    By reason of the foregoing, CSIM and CS&Co. violated Sections 17(a)(2) and

6    (3) of the Securities Act [15 U.S.C. § 77q(a)(2) and (3)].

7                          **SECOND CLAIM FOR RELIEF**

8                              (Against CSIM)
     Violations of Sections 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)]
9            and Rule 206(4)-8 [17 C.F.R. § 275.206(4)-8] Thereunder

10       42.    The Commission realleges and incorporates by this reference Paragraphs 1

11   through 37 above.

12       43.    CSIM, while acting as an investment adviser, directly or indirectly, by use of

13   the mails or means or instrumentality of interstate commerce, engaged in acts, practices, or

14   courses of business that were fraudulent, deceptive, or manipulative.

15       44.    CSIM, while acting as an investment advisers to pooled investment vehicles:

16   (a) made untrue statements of material facts or omitted to state material facts necessary in

17   order to make the statements made, in the light of the circumstances under which they were

18   made, not misleading, to investors or prospective investors in the pooled investment vehicle;

19   or (b) engaged in acts, practices, or courses of business that were fraudulent, deceptive, or

20   manipulative with respect to investors or prospective investors in the pooled investment

21   vehicle.

22       45.    CSIM willfully violated Section 206(4) of the Advisers Act [15 U.S.C. § 80b-

23   6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8] by, as described above,

24   materially misstating the Fund's WAM and by making materially false and misleading

COMPLAINT                                    -16-

1  statements about the Fund during its decline.

2  46.  By reason of the foregoing, CSIM violated Section 206(4) of the Advisers Act

3  [15 U.S.C. § 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8].

4  **THIRD CLAIM FOR RELIEF**

5  (Against CSIM and CS&Co.)
   Aiding and Abetting Violations of

6  Section 34(b) of the Investment Company Act [15 U.S.C. §§ 80a-33(b) and 80a-47]

7  47.  The Commission realleges and incorporates by this reference Paragraphs 1

8  through 37 above.

9  48.  Schwab Investments made untrue statements of material fact, and/or omitted

10  facts necessary in order to prevent statements made, in the light of the circumstances under

11  which they were made, from being materially misleading, in registration statements,

12  applications, reports, accounts, records, or other documents filed or transmitted pursuant to

13  the Investment Company Act.

14  49.  Schwab Investments thereby violated Section 34(b) of the Investment

15  Company Act [15 U.S.C. §80a-33(b)].

16  50.  CSIM and CS&Co. knowingly or recklessly provided substantial assistance to

17  Schwab Investments and thereby aided and abetted said violations of Section 34(b) of the

18  Investment Company Act [15 U.S.C. § 80a-33(b)].

19  51.  CSIM and CS&Co. willfully aided and abetted and caused violations of

20  Section 34(b) of the Investment Company Act [15 U.S.C. § 80a-33(b)] because, as described

21  above, they provided substantial assistance to persons making the misstatements and

22  omissions detailed above that appeared in sales materials filed with NASD or FINRA and,

23  consequently with the Commission. CSIM and CS&Co. also willfully aided and abetted and

24  caused violations of Section 34(b) of the Investment Company Act[15 U.S.C. § 80a-33(b)] by,

COMPLAINT                                           -17-

1   as described above, providing substantial assistance regarding (1) a Form N-CSR Annual

2   Report dated August 31, 2007, misstating the Fund's WAM; (2) a Registration Statement

3   stating that the YieldPlus Fund would not invest more than 25% of its assets in non-agency

4   MBS at a time when the Fund exceeded that concentration limitation; and (3) a Form 485B

5   falsely certifying that it contained no material changes when it included the unauthorized

6   change to the funds' concentration policy.

7       52.     Accordingly, pursuant to Section 48(b) of the Investment Company Act [15

8   U.S.C. §80a-48(b), as amended pursuant to Section 929M of the Dodd-Frank Wall Street

9   Reform and Consumer Protection Act (the "Dodd-Frank Act"), Public Law 111-203, 2010

10   HR 4173 (July 2010)], CSIM and CS&Co. aided and abetted violations of Section 34(b) of

11   the Investment Company Act [15 U.S.C. §80a-33(b)].

12                            **FOURTH CLAIM FOR RELIEF**

13                        (Against Schwab Investments)
     Violations of Section 13(a) of the Investment Company Act [15 U.S.C. § 80a-13(a)]

14

15       53.     The Commission realleges and incorporates by this reference Paragraphs 1

  through 37 above.

16

17       54.     Schwab Investments deviated from its policy in respect of concentration of

  investments in a particular industry or group of industries as recited in its registration

18

19   statement, deviated from an investment policy which is changeable only if authorized by

  shareholder vote, and deviated from a policy recited in its registration statement pursuant to

20

21   Section 8(b)(3) of the Investment Company Act [15 U.S.C. § 80a-8(b)(3)].

      55.     As described above, Schwab Investments deviated from the bond funds'

22

23   concentration policy without obtaining shareholder approval when the YieldPlus Fund and the

  Total Bond Fund invested more than 25% of their assets in non-agency MBS.

24

COMPLAINT                   -18-

1     56.    By reason of the foregoing, Schwab Investments violated Section 13(a) of the

2     Investment Company Act [15 U.S.C. § 80a-13(a)].

3                            **FIFTH CLAIM FOR RELIEF**

4                                  (Against CSIM)
                            Aiding and Abetting Violations of
5     Section 13(a) of the Investment Company Act [15 U.S.C. §§ 80a-13(a) and 80a-48]

6     57.    The Commission realleges and incorporates by this reference Paragraphs 1

7     through 37 above.

8     58.    Schwab Investments deviated from its policy in respect of concentration of

9     investments in a particular industry or group of industries as recited in its registration

10    statement, deviated from an investment policy which is changeable only if authorized by

11    shareholder vote, and deviated from a policy recited in its registration statement pursuant to

12    Section 8(b)(3) of the Investment Company Act [15 U.S.C. § 80a-8(b)(3)].

13    59.    By reason of the foregoing, Schwab Investments violated Section 13(a) of the

14    Investment Company Act [15 U.S.C. § 80a-13(a)].

15    60.    CSIM knowingly or recklessly provided substantial assistance to and thereby

16    aided and abetted Schwab Investments in its violations of Section 13(a) of the Investment

17    Company Act [15 U.S.C. § 80a-13(a)].

18    61.    CSIM willfully aided and abetted and caused the violations when, as described

19    above, it directed the investments in MBS in excess of the YieldPlus Fund's 25% limit,

20    proposed the change to the funds' concentration policy, and directed the Total Bond Fund's

21    investment of over one-third of assets in non-agency MBS.

22    62.    Accordingly, CSIM is liable pursuant to Section 48(b) of the Investment

23    Company Act [15 U.S.C. 80a-48(b), as amended pursuant to Section 929M of the Dodd-Frank

24    Act] to the same extent as Schwab Investments.

COMPLAINT                          -19-

1 | **SIXTH CLAIM FOR RELIEF**

2 | (Against CSIM)
Violation of Section 204A of the Advisers Act [15 U.S.C. § 80b-4a]

3 |

4 | 63.     The Commission realleges and incorporates by this reference Paragraphs 1

5 | through 37 above.

6 | 64.     CSIM did not establish, maintain, and enforce written policies and procedures

7 | reasonably designed, taking into consideration the nature of its investment adviser business, to

8 | prevent the misuse, in violation of the Advisers Act, or the rules or regulations thereunder, of

9 | material, nonpublic information by CSIM or any person or fund associated with CSIM.

10 | 65.     By reason of the foregoing, CSIM violated Section 204A of the Advisers Act

11 | [15 U.S.C. § 80b-4a].

12 | **SEVENTH CLAIM FOR RELIEF**

13 | (Against CS&Co.)
Violation of Section 15(g) of the Exchange Act [15 U.S.C. § 78o(g)]

14 |

15 | 66.     The Commission realleges and incorporates by this reference Paragraphs 1

16 | through 37 above.

17 | 67.     CS&Co. did not establish, maintain and enforce written policies and

18 | procedures reasonably designed, taking into consideration the nature of its broker-dealer

19 | business, to prevent the misuse, in violation of the Exchange Act or the rules or regulations

20 | thereunder, of material, nonpublic information by CS&Co. or any person or fund associated

21 | with it.

22 | 68.     By reason of the foregoing, CS&Co. violated Section 15(g) of the Exchange

23 | Act [15 U.S.C. § 78o(g)].

24 |

COMPLAINT                                    -20-

1    **PRAYER FOR RELIEF**

2    WHEREFORE, the Commission respectfully requests that this Court:

3    I.

4    Order CSIM and CS&Co. to pay civil penalties pursuant to Section 20(d) of the

5    Securities Act [15 U.S.C. § 77t(d)], Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)],

6    Section 42(e) of the Investment Company Act [15 U.S.C. § 80a-41(e)], and Section 209(e) of

7    the Advisers Act [15 U.S.C. § 80b-9(e)].

8    II.

9    Order CSIM to disgorge any ill-gotten gains, including prejudgment interest;

10    III.

11    Retain jurisdiction of this action in accordance with the principles of equity and the

12    Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders

13    and decrees that may be entered, or to entertain any suitable application or motion for

14    additional relief within the jurisdiction of this Court; and

1                                              V.

2          Grant such other relief as is just and appropriate.

3     DATED: January 11, 2011                Respectfully Submitted,

4

5

6                                            David J. Gottesman
                                             Frederick L. Block
7                                            Antonia Chion
                                             Robert A. Cohen
                                             Melissa R. Hodgman
8                                            David S. Mendel

9                                            Attorneys for Plaintiff
                                             SECURITIES AND EXCHANGE COMMISSION
10                                           100 F Street, N.E.
                                             Washington, DC 20549-4030
11                                           Telephone: (202) 551-4470 (Gottesman)
                                             Facsimile: (202) 772-9245 (Gottesman)
12

13

14

15

16

17

18

19

20

21

22

23

24